IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SALVADOR MENDOZA,<br><br>Defendant. | No. 3:09-cr-0115-JAJ<br><br><br><br>**ORDER** |

This matter comes before the court pursuant to the defendant's March 9, 2010 Motion to Suppress Evidence [dkt 49]. The court held an evidentiary hearing on this motion on April 15, 2010, at which the defendant was present and represented by F. Montgomery Brown. The government was represented by Cliff Cronk. The defendant's motion to suppress is denied.

In the defendant's motion to suppress, he challenges the warrantless search of his pickup truck and residence on August 1, 2007. The government contends that the initial encounter with the defendant was consensual, and the search of the vehicle was justified by a positive alert from a drug sniffing dog. It further contends that the defendant consented to the search of his residence. The court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

In July 2007, Detective Matt Hansen of the Iowa City Police Department's Street Crime Unit was conducting an investigation of a person he knew by the name of Victor Quintero. Prior to August 1, 2007, neighbors of the defendant, Salvador Mendoza ("the defendant" or "Mendoza"), observed high volume, short duration traffic associated with the defendant's residence at 1715 Louis Place in Iowa City. The residence was registered with a utility company under the name Victor Quintero. However, a red pickup truck

commonly parked at that location was registered to a Michael Valencia of Muscatine, Iowa. The truck was associated with some of the activity that Hansen found to be suspicious. There was also a black Hummer truck observed at 1715 Louis Place registered to Victor Quintero at an address in the Forest View Trailer Park in Iowa City. An anonymous tip to the police had informed them that a man with a black Hummer was selling controlled substances at the Forest View Trailer Park.

Hansen called Deputy Ardith Orr of the Muscatine County Drug Task Force to determine if that task force was familiar with Michael Valencia, the registered owner of the red pickup truck. Deputy Orr informed Hansen that Valencia was a cocaine distributor in Muscatine. She was also familiar with another distributor, Victor Quintero, whose true name is Salvador Mendoza, also known as Chava. There was no indication that Salvador Mendoza had a driver's license and police could find no other driving records relating to him. Muscatine County Drug Task Force personnel also informed Officer Hansen that Salvador Mendoza, and not Victor Quintero, was the real identity of the man they believed to be distributing cocaine in Muscatine.

Hansen and others decided to do surveillance of the defendant's residence at 1715 Louis Place on August 1, 2007. Approximately ten to twelve police officers participated in the surveillance. It began at approximately 6:00 p.m. Sometime thereafter but before 8:00 p.m., the red pickup truck registered to Michael Valencia left the residence, went to downtown Iowa City to the post office and then left town on Highway 6, heading east towards West Liberty, Iowa. The driver began a series of evasive driving moves. He would not signal turns, he was not always in his proper lane, and he drove erratically and stopped occasionally. From this, the police believed that he was attempting to do counter surveillance. Because of this, the police decided to stop the pickup truck.

As the police followed the pickup for the final time in unmarked cars, the driver simply pulled over to the side of the road. Police did not activate any lights or sirens; they

were simply following the driver. As he stopped, police officer Paul Batcheller of the Iowa City Police Department was in the car immediately behind the pickup. The driver got out of his car, greeted the police, speaking in Spanish and some broken English. The driver identified himself as Victor Quintero. The police later received a driver's license from the driver in the name of Victor Quintero. The driver was Mendoza, the defendant in this case.

Because the defendant spoke only very broken English, officers on the scene immediately made the decision to summon a Spanish speaking police officer. At the same time, they requested the assistance of a drug sniffing dog. The dog and its handler Kevin Berg arrived first. The Spanish interpreter arrived second. Both arrived within approximately fifteen to twenty minutes after they were called.

When Officer Berg and his drug sniffing dog Naton arrived, Naton was directed to sniff the perimeter of the defendant's vehicle. As the dog passed the driver's door, it indicated that it had detected the odor of controlled substances. The police then searched the pickup truck and found a canister appearing to be like those used for the repair of flat tires. However, it contained a hidden compartment with cocaine residue.

The interpreter, Officer Jeffrey Fink, arrived at the scene of the police with the defendant on or near Sand Road after Officer Berg and Naton had begun their work. Detective Batcheller requested the assistance of Officer Fink in attempting to secure consent to search the defendant's residence on Louis Place in Iowa City. Officer Fink is an exceedingly well-qualified interpreter. Fink began by informing the defendant as to why he had been detained by the police, why they were out there and what they wanted from him. Fink specifically requested consent to search the defendant's residence. The defendant, however, would not answer yes or no. Rather, his responses were ambiguous. Fink presented the defendant with a consent to search form. The defendant refused to sign it but only because the police would not include a promise on the form to refrain from

3

asking questions after the search. The defendant repeated several times that if the police promised not to ask questions after the search then they could search the residence. As a part of the process, Fink specifically advised the defendant that he was free to withhold consent. Finally, Detective Batcheller informed the defendant, through the interpreter, that if the police did not find anything then they would have no reason to question the defendant about it. The defendant, still concerned about adding some language to the form, finally indicated a willingness to agree to the search by motioning to the police in a way that told them it was okay, and stating, "Go, my house, now." Govt. Exh. 1 at 20:37:07.

If the foregoing was the only evidence regarding the defendant's consent, the court would be hesitant to find that the defendant had consented to the search. However, the defendant's subsequent behavior convinces the court that the defendant had in fact consented to the search of his residence.

Before Officers Fink and Berg had arrived at the location of the defendant's truck, Detective Hansen had already gone back to the defendant's residence at 1715 Louis Place to secure it. He had determined that either the police would get consent to search it or he would secure a search warrant. Hansen determined that the address was vacant as it was dark and no one came to the residence or left it while he was there. As he was waiting to determine whether consent would be given, Hansen observed several police cars arrive at the residence. The defendant arrived in his own pickup truck. As the defendant got out of his truck, he walked to the front of his residence, took his keys out of his pocket and opened the door to allow the police officers to enter.

Inside, the defendant sat on the couch in the living room while police officers searched the residence. Officer Fink remained with the defendant so that he could interpret for the police. Before they began searching, police asked several questions about which rooms belonged to the defendant and whether there were other people who lived there. They were informed that they could search all the common areas and the

defendant's bedroom. He indicated that a man named Ivan lived in the basement and the police could not search Ivan's bedroom. However, police searched the remainder of the basement. In the basement, there was a large freshly drywalled storage area containing air purifiers, chisels, mixing equipment, large bowls, Inositol powder[1], some kind of a wooden press and white filmy residue all over the walls. The police initially believed that the white residue was drywall compound. They later determined that it was cocaine residue. They found scales and packaging material as well. In the kitchen, the police found other items consistent with packaging or repackaging of cocaine.

Throughout the period of the search, the defendant and Officer Fink casually talked about items unrelated to the purpose of this search. The defendant never indicated that the police were not welcome or that he wanted them to stop. He was never placed under arrest or even in handcuffs. No automobiles were seized from him that evening. However, the police found $4,100 in cash in his bedroom and $800 in cash in his truck that were seized.

## II. CONCLUSIONS OF LAW

The Fourth Amendment protects individuals against unreasonable searches and seizures by the government. United States v. Parker, 587 F.3d 871, 878 (8th Cir. 2009). Here, the defendant contests his initial alleged seizure, the search of his vehicle, and the search of his home. The government responds that he was not seized, the search of his vehicle was based on probable cause, and the search of his home was performed pursuant to the defendant's consent.

### A. THE INITIAL ENCOUNTER

1. Whether the initial encounter constituted a seizure

Mendoza argues that his roadside encounter with the police constituted a seizure, and thus is subject to the reasonableness requirement of the Fourth Amendment. Mendoza

---

[1] A common cutting agent for cocaine.

argues that he was stopped, either by the behavior of Batcheller in following his truck closely. He was obviously later detained at the roadside by the large police presence, the confiscation of his money and cell phones, the frisk, Batcheller's admission that after finding the canister Mendoza was not free to leave, and the language barrier. The government asserts that the initial encounter was consensual, citing the fact that Mendoza pulled over and got out of his car on his own. Because it was a consensual encounter, the government argues, the reasonableness requirement of the Fourth Amendment does not apply.

The court need not reach this issue to resolve this portion of Mendoza's motion. If Mendoza's initial encounter with the police constituted a seizure under the Fourth Amendment, the seizure was reasonable because it was supported by probable cause, as explained below.

2. Whether the seizure was reasonable

The court assumes for the purpose of this discussion that the encounter with the police constituted a seizure. As a seizure, the stop and detention of Mendoza is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren v. United States, 517 U.S. 806, 810 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (citations omitted). It is clear that here the police had probable cause to believe that Mendoza had committed numerous traffic violations. First, the police had observed him failing to signal turns and using improper lanes. Second, they knew that he was driving without a driver's license. Indeed, Mendoza concedes that the record may establish that the police had probable cause to believe that he did not have a valid driver's license on the day he was stopped.

But Mendoza asserts that these traffic violations were not the reason the police approached him. Indeed, this is clear from the testimony of the police officers, who were

admittedly interested only in his suspected drug activity, not traffic violations. But "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren, 517 U.S. at 813. The Supreme Court in Whren cited several cases that "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." Id. "An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." United States v. Pena-Ponce, 588 F.3d 579, 583 (8th Cir. 2009) (citation omitted).

But Mendoza also contests his subsequent detention, arguing that its scope was not justified by the limited purpose of the stop – to enforce the traffic violations and determine whether Mendoza had a valid driver's license. Indeed, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005) (citation omitted). More specifically, a seizure that is justified only by the interest in enforcing traffic violations "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id.

Here, police were entitled to determine whether Mendoza had a valid driver's license. When he got out of the car, Mendoza identified himself as Victor Quintero. Because of the language barrier, no further communication could take place until an interpreter arrived. The fifteen to twenty minute additional detention occasioned by the wait for the interpreter, even in the context of an investigation of driving without a license, was not unreasonable. As in Caballes, the duration of this detention "was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." Caballes, 543 U.S. at 408. Indeed, the ordinary inquiries incident to the traffic stop could only be made after the arrival of the interpreter.

Mendoza also argues that the stop was expanded to include investigation of drug trafficking unsubstantiated by even reasonable suspicion. Mendoza cites cases for the proposition that if the officer expands the scope of a traffic stop, or detains the defendant after the traffic stop is complete, the officer must have reasonable suspicion of some criminal activity. See United States v. Guerrero, 374 F.3d 584, 589 (8th Cir. 2004) ("it would be an unreasonable extension of the scope of the stop, however, for [the officer] to further detain [the defendant] or his vehicle unless something occurred during the traffic stop to generate the necessary reasonable suspicion to justify further detention"); United States v. Ehrmann, 421 F.3d 774, 780 (8th Cir. 2005) ("An officer cannot continue to detain a motorist after the officer completes the initial stop, unless the officer has 'a reasonably articulable suspicion for believing' criminal activity is afoot") (citations omitted).

But the officers did not expand the scope of the stop, or further detain the defendant after the completion of an initial stop, before the arrival of the interpreter and the subsequent inquiries they were entitled to make incident to the traffic stop. The only thing that happened while waiting for the interpreter was that the K-9 unit arrived and conducted the dog sniff. This does not constitute an expansion of the scope of the stop. As the Supreme Court has said, "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed [the defendant's] constitutionally protected interest in privacy." Caballes, 543 U.S. at 408. The Court went on to hold that the use of a narcotics detection dog "during a lawful traffic stop, generally does not implicate legitimate privacy interests." Id. at 409. Here, as in Caballes, "the dog sniff was performed on the exterior of [the defendant's] car while he was lawfully seized for a traffic violation." Id. "Any intrusion on [the defendant's] privacy expectations does not rise to the level of a constitutionally cognizable infringement." Id. Because the dog sniff was

carried out during a reasonable wait for an interpreter to follow up on the traffic violations, it is irrelevant that before the dog sniff the officers had no reasonable suspicion of drug activity.

In sum, there was nothing unreasonable about any of the three turns in events identified thus far – the stop, the additional detention, and the dog sniff. There was probable cause to stop Mendoza. His additional detention was justified by the reasonable means necessary to effect the ordinary inquiries incident to the stop – the summoning of the interpreter. During that detention, an exterior dog sniff – which does not implicate any legitimate privacy interests – was performed on Mendoza's truck. Under the law cited above, Mendoza's seizure in this context was reasonable.

Because the court rejects Mendoza's argument that his seizure was unreasonable, the court also rejects Mendoza's derivative argument that all evidence resulting from the seizure is fruit of the poisonous tree and should be excluded under Wong Sun v. United States, 371 U.S. 471 (1963).

## B. THE SEARCH OF THE VEHICLE

"A positive identification by a dog during a canine search following a lawful stop of a vehicle provides probable cause that drugs are present in the vehicle, thereby justifying a search of the vehicle." United States v. Mohamed, 600 F.3d 1000, 1004 (8th Cir. 2010) (citing United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) (en banc)). Thus, when the dog alerted on Mendoza's vehicle, the officers had probable cause to search the vehicle without a warrant. United States v. Engler, 521 F.3d 965, 971 (8th Cir. 2008) (citing United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999)). Accordingly, there was no Fourth Amendment violation in the search of the vehicle.

## C. THE SEARCH OF THE RESIDENCE

"Searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." United States v. Muhammad, --- F.3d ----, 2010 WL 1850523 (8th Cir. May 11, 2010) (citing Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)) (internal quotation marks and additional citation omitted). "[O]ne exception to the Fourth Amendment's search warrant requirement is voluntary consent to a search." United States v. Parker, 587 F.3d 871, 878 (8th Cir. 2009) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). In particular, "[a] warrantless search of a residence does not violate the Fourth Amendment if voluntary consent has been given by a resident." United States v. Cisneros-Gutierrez, 598 F.3d 997, 1003 (8th Cir. 2010) (citing Schneckloth, 412 U.S. at 222).

"The test applied to determine if consent is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005) (citation omitted). "The government bears the burden of showing consent was freely and voluntar[ily] given and not a result of duress or coercion … and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority." Id. (citing Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)). "Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making." Id. (internal citation and quotation marks omitted).

"In determining voluntariness, the personal characteristics of the individual who supposedly consented and the environment in which the consent allegedly occurred are relevant." Cisneros-Gutierrez, 598 F.3d at 1003 (citation omitted). Regarding personal characteristics, the Eighth Circuit considers "the party's age, intelligence and education,

whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects." United States v. Barnum, 564 F.3d 964, 969 (8th Cir. 2009) (citation omitted). Regarding the environment in which the alleged consent occurred, the Eighth Circuit considers "(1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as the search occurred." Id. (citation omitted).

These factors show that Mendoza voluntarily consented to the search of his residence. The police did not threaten, physically intimidate, or punish him. He was not under arrest when the consent was given, and the consent occurred in a public place. He was informed of his right to withhold consent. He negotiated the consent, trying to get the police to agree to certain conditions, strongly indicating his understanding that he need not give his consent. While he was clearly detained at the roadside for at least thirty minutes, if not longer, this was due to the combination of the reasonably short wait for the interpreter, and Mendoza's own attempts to negotiate his consent to the search.

But most important was his behavior. "Whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." Pena-Ponce, 588 F.3d at 584 (internal quotation marks and citation omitted). "The focus is not whether the defendant subjectively consented, but rather, whether a reasonable officer would believe consent was given and can be inferred from words, gestures, or other conduct." Id. (citations, brackets, and internal quotation marks omitted). Indeed, "[a] person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to

11

consent." United States v. Coney, 456 F.3d 850, 860 (8th Cir. 2006) (citation and quotation marks omitted).

Here, Mendoza's behavior indicated consent. He motioned to the officers that it was okay to go search the house, and made oral representations to them indicating agreement to let them search the house. He led them back to his house, and opened the house to let the officers inside. See United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (consent to search voluntary because defendant opened door to let police in). He stood by as the search occurred, chatting with officers. See United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994) (approving district court's finding of consent from, in part, defendant's general demeanor of amicably chatting with officer during search). He did not protest the search, or ask the officers to stop. See United States v. Ringold, 335 F.3d 1168, 1175 (10th Cir. 2003) (approving district court's finding of consent from, in part, defendant's failure to object to the search). In this context, a reasonable officer would infer from Mendoza's words, gestures, and behavior that he had consented to the search of his home.

Mendoza argues that his consent was not voluntary because he had been followed and pulled over by a group of officers, the police took his property, a drug dog was brought to the scene, and the police searched his vehicle. With so many officers present, Mendoza argues, the evidence indicates only that he merely acquiesced to a claim of lawful authority. But Mendoza's own attempts to negotiate his consent belie this position. Mendoza clearly knew he had some leverage regarding whether to give consent; he knew he had a choice in the matter. See Coney, 456 F.3d at 860 (defendant's initial refusal to give consent showed that he knew he was not required to consent to a search). Moreover, the police, far from conveying under a claim of lawful authority that compliance was required, did just the opposite, specifically informing Mendoza of his right to refuse consent.

In this context, a reasonable person would believe that Mendoza's consent was "the product of an essentially free and unconstrained choice," and that Mendoza comprehended the choice he was making. <u>Sanders</u>, 424 F.3d at 773. His "words, gestures, [and] other conduct" all indicated he was giving consent without coercion. <u>Pena-Ponce</u>, 588 F.3d at 584. The court finds that Mendoza voluntarily consented to the search of his residence, and therefore the search did not violate the Fourth Amendment. <u>Cisneros-Gutierrez</u>, 598 F.3d at 1003.

### III. CONCLUSION

Upon the foregoing,

**IT IS ORDERED** that Mendoza's motion to suppress [dkt 49] is denied.

**DATED** this 4th day of June, 2010.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA